**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**STATE OF NEW YORK,**

                              **Plaintiff,**

**v.**
                                                                    **97-CV-0596Sr**

**PVS CHEMICALS, INC.,**

                              **Defendant.**

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment. Dkt. #45.

## BACKGROUND

By letter dated April 3, 1985, the New York State Department of Environmental Conservation ("NYSDEC"), advised PVS Chemicals, Inc. ("PVS Chemicals"), that its property at 55 Lee Street, Buffalo, New York (Site Code 915004), identified as the Allied Chemical, Industrial Chemical Division site, was included on the registry of inactive hazardous waste disposal sites in New York as a Class 2a site based upon groundwater samples indicating violation of standards for iron, lead and pH. Exh. 22.

A Phase I Investigation of the property, dated January, 1986, recounted that prior to the purchase of the property by PVS Chemical, Allied Chemical Corporation

maintained a holding pond which received wastewater containing, *inter alia*, nitric acid

and sufluric acids, sulfur drainings, metallic nitric rinses (containing cadmium, copper,

nickel, potassium and iron). Exh. 27. The Phase I Investigation further noted that the

holding pond was removed from service in 1977, with accumulated solids and

contaminated soil excavated and transported for appropriate disposal. Exh. 27. The

Phase I Investigation acknowledged that groundwater samples detected heavy metals,

including copper, iron, lead, nickel and vanadium, with concentrations of iron and lead

exceeding the standards for drinking water, as well as excessive pH. Exh. 27.


In 1987, PVS Chemical purchased additional property from Allied

Chemical Corporation pursuant to an agreement whereby Allied Chemical Corporation

agreed to hold PVS Chemical harmless against any environmental remedial actions

required by the environmental condition of a parcel of that property as of the closing

date. Exh. 28.


A Phase II Investigation, dated October, 1989, determined that

Groundwater releases of benzene, toluene, aluminum,
cadmium, calcium, potassium, silver, vanadium, and
mercury potentially attributable to the site was a major
finding of this investigation. Since groundwater is not used
locally as a drinking water source, the releases do not
appear to pose a significant public health threat. However,
groundwater contamination in the area should be addressed
for environmental reasons, and the potential for groundwater
discharge to the Buffalo River. Additional investigation may
be necessary to show conclusively that the former Allied
Chemical surface impoundment is causing groundwater
contamination. Given the site setting, with its thick mantle of
low permeability clay and a fractured bedrock regime, it may

> be that other sources in this heavily industrialized area are
> contributing to the groundwater contamination.

Exh. 33.

A Comprehensive Groundwater Monitoring Evaluation, dated December, 1991, recommended further evaluation. Exh. 35.

On February 10, 1993, the NYSDEC advised PVS Chemicals that it had "not identified any hazardous wastes at this site." Exh. 39. As a result, the NYSDEC notified PVS Chemicals

> of the deletion of such site from the Registry of Inactive
> Hazardous Waste Disposal Sites in New York State. This
> site will not appear in future registries, unless information is
> brought to our attention which justifies relisting the site.

Exh. 39.

On July 24, 1997, the State of New York commenced this action alleging that PVS Chemicals violated the Clean Water Act; Resource Conservation and Recovery Act; articles 17 and 19 of the New York Environmental Conservation Law and related state regulations addressing water and air pollution, respectively, and engaged in a public nuisance by discharging and disposing of pollutants into the waters of New York, including the Buffalo River and groundwater, and into the air, and by maintaining illegal solid and hazardous waste activities and contaminated conditions at PVS Chemicals' Buffalo facility. Dkt. #1. A Second Amended Complaint was filed on February 11, 2000. Exh. 45.

By letter dated March 1, 2000, the State of New York outlined a five step process for resolution of groundwater-related issues: (1) development of a site investigation work plan; (2) implementation of a site investigation work plan; (3) submission of a site investigation report; (4) submission of a "work plan for corrective measures study that evaluates potential corrective measures to remediate impacted environmental media; and (5) implementation of approved corrective measures work plan. Exh. 47. The State of New York emphasized its position that

> in order to settle this lawsuit, it is essential that PVS make a firm commitment from the outset to undertake and complete this sequential process for addressing the State's concerns regarding groundwater and related environmental resources. . . . The State will not settle the claims in its complaint piecemeal. For settlement to occur, the past inability to resolve this and other issues must be overcome in a comprehensive, binding legal document.

Exh. 47.

By letter dated June 16, 2000, PVS Chemicals submitted a Work Plan for Environmental Site Investigation. Exh. 51.

By letter dated July 10, 2000, the State of New York provided PVS Chemical with a proposed Consent Decree for settlement of this litigation. Exh. 52.

By letter dated August 2, 2000, PVS Chemicals responded that the proposed consent decree failed to offer any definite resolution of any issue. Exh.54.

A Consent Decree dated September, 2000 proposes 5 groundwater-related measures, including: (1) submission of a site investigation work plan; (2) submission of a site investigation report; (3) submission of a work plan for a corrective measures study; (4) submission of a corrective measures study work plan; and (5) implementation and completion of the corrective measures. Exh. 53.

By settlement memorandum dated December 5, 2000, PVS Chemicals advised that it had submitted

> a "Work Plan" for Environmental Site Investigation (ET-832), dated May 30, 2000 prepared by Frontier Technical Associates, Inc. . . . Currently, two companies which own property immediately adjacent to PVS, Buffalo Color Corporation and Mobil Oil, are engaged in groundwater studies concerning their facilities which have extended onto PVS's property. Buffalo Color has drilled and sampled from a number of wells on the PVS property. Mobil Oil will shortly be engaged in sampling on the PVS property. Both of these projects, with the consent and cooperation of PVS, involve contamination migrating from these two adjacent facilities.
>
> In 1989 at the request of the DEC Division of Hazardous Waste Remediation, a Phase II investigation was undertaken with respect to a portion of PVS's facility on which Allied Chemical Company operated an unlined lagoon. Records indicated that the lagoon was clean and closed in 1978 and all excavated materials were disposed of offsite on behalf of Allied Chemical Company. The site was originally included on the list of inactive hazardous waste facilities prepared by New York in the late 1970s. The Phase II study initiated in 1989 was at the request of the State. The study concluded that hazardous waste was not present at the site and it was delisted (removed from the list of inactive hazardous waste sites). Subsequently, pursuant to ECL § 27-1316, the site was listed as one containing hazardous substances and posing a "significant threat to the environment." The basis of this decision was the State's review of groundwater results from the prior Phase II study. PVS submitted a comment letter dated February 27, 1995 . .

. which questioned the conclusion of the study and provided results from proper sampling. Subsequently, the State removed the site from the hazardous substance disposal site study by letter dated May 8, 1995 . . . . The reason for this removal was expressed in a DEC document as follows: "does not pose significant threat."

The legal basis for any further groundwater study at PVS would be evidence of a significant threat to the environment. In fact, no such evidence exists. Nevertheless, PVS will agree to perform the attached Work Plan.

Exh. 55.

By letter dated January 5, 2001, the State of New York responded that it was "prepared to enter into a comprehensive settlement of the referenced litigation pursuant to a revised Consent Decree." Exh. 56. As to groundwater-related measures, the State of New York explained:

As you know, the State's claims in this regard are not limited to any single former impoundment. Rather, they are based on a history of various acts and omissions as well as documented conditions. For purposes of settlement, the proposed site investigation work plan should be revised, with regard to groundwater investigation, to focus along the Buffalo River shoreline. A total of nine wells . . . should be the subject of groundwater sampling for four quarters.

As to soil investigation, the proposed work plan should be revised to provide a figure outlining the approximate locations of proposed soil samples. Exact sample locations should be determined in the field and biased for areas where sufur contamination is expected to be present. Additionally, the plan as outlined does not contemplate obtaining soil samples below a depth of twelve inches. Samples need to be collected at depths to adequately characterize the extent of contamination, pursuant to a sampling design that ensures the same which is based on the company's understanding of the history of deposition.

Upon its approval by the State, the revised work plan should be implemented. After its implementation, a combined site investigation report/corrective measures study should be submitted for approval. This document should analyze and interpret the data, evaluate remedial alternatives, including no action, additional monitoring and corretive action, make recommendations regarding the same, and provide for implementation by the company of any such measures upon State approval.

Exh. 56.

In a Settlement Memorandum dated February 16, 2001, PVS Chemicals

reiterated that

the settlement must resolve all outstanding items. PVS cannot settle on the basis of submittals which are not reviewed and approved prior to entry of the settlement. PVS also objects to the requirement of a "combined site investigation report/corrective measure study." This requirement assumes the results of the Environmental Site Investigation. Contrary to Plaintiff's assertion regarding a "history of various acts and omissions as well as documented conditions," PVS will [sic] concede RCRA violations. It is prepared to implement the proposed Investigation if approved prior to Settlement. The proposed Investigation provides for reports of the results of both the groundwater and soil investigation . . . If there is a basis for RCRA claims or remedies as indicated by the data generated by the proposed Investigation, that can be the subject of discussions and negotiation between PVS and DEC. PVS does not believe that it is the intent of the Consent Order to provide the context for all future regulatory actions and relations between the parties.

Exh. 58.

By letter dated April 20, 2001, the State of New York advised:

As to Section VIII (Groundwater-Related Measures), the State requires the undertaking of measures as previously

drafted by the State in this section, with modifications as described in my January 5, 2001 letter. In the alternative, the proposed change that limits defendant's commitment to performance of a site investigation in accordance with an approved site investigation work plan could be accompanied by a corresponding limited release. The State would reserve its rights to proceed against defendant for any liability that may result from the State's determination that further measures are required, and defendant would reserve its rights to defend. With such a limited commitment by defendant, however, there would have to be more of a comprehensive site-wide investigation, rather than the compromise of a limited investigation as described in my January 5, 2001 letter. Please let me know which of these two alternatives you prefer; work plan revisions will be necessary in either case. Such alternative Consent Decree language, if necessary, can be discussed for this section, assuming an overall settlement otherwise seems feasible.

Exh. 60.


By letter dated May 4, 2001, PVS Chemicals advised:

I understand your alternative of a limited release in exchange for the proposed site investigation. However, it also appears that the proposal is not acceptable because you suggest both a more "comprehensive site-wide investigation" and that "work plan revisions will be necessary in either case." Thus, it appears that the initial proposal prepared by Frontier Technical Associates in response to meetings with DEC in Spring, 2000 and the revised work plan in response to the comments of your letter of January 5, 2001, submitted February 16, 2001 are being rejected. Again, there appears to be no rationale or technical review.

It has always been my client's position that settlement would require definitive resolution on each issue. That, of course, is why various work plans were prepared and submitted.

Exh. 61.

On May 24, 2001, the State of New York proposed changes to the Work

Plan for Environmental Site Investigation (ET-832), dated February 2, 2001. Exh. 63.


The State provided a Stipulation and Order of Partial Settlement on March

5, 2002, which set forth the following paragraph with respect to Groundwater and Soil-

Related Investigation:

> PVS has submitted and the State has approved a "Work
> Plan for Environmental Site Investigation at PVS Chemical
> Solutions, Inc." ("Site Investigation Work Plan") prepared by
> Frontier Technical Associates, Inc. The Site Investigation
> Work Plan is incorporated herein and made a part of this
> Stipulation and Order. A Copy of the Site Investigation Work
> Plan is attached as Exhibit A. Upon the effective date of this
> Stipulation and Order, PVS shall commence performance of,
> and thereafter complete the timely implementation of, the
> environmental site investigation in accordance with all the
> terms of the Site Investigation Work Plan, including but not
> limited to the timely delivery of the reports described therein.

Exh. 65. The Stipulation and Order of Partial Settlement also provides:

> Except as provided in the Reservation of Rights set forth
> above, this Stipulation and Order shall be in full settlement
> of all pending civil claims and liabilities against defendant, its
> directors, officers and employees that are alleged in the
> complaint and occurred at the facility prior to the effective
> date of this Stipulation and Order. The Stipulation and Order
> shall not be construed as being in settlement of events
> regarding which the State lacks knowledge, or occurring
> after the effective date of this Stipulation and Order

Exh. 65. The Reservation of Rights section provided, in relevant part that

> Nothing contain in this Stipulation and Order shall be
> construed as barring, diminishing, adjudicating or in any way
> affecting:
>
> 1. The State's right to proceed against defendant for any
>    liability that may result from the State's determination
>    that further groundwater and/or soil-related measures are

required by law to be performed by defendant, and defendant's right to defend against the same;

2. The State's right to enforce this Stipulation and Order against defendant in the event that defendant fails to fulfill any of the terms or provisions hereof;

3. The Parties' obligation to comply with any and all applicable federal or state laws or regulations;

4. Any legal or equitable rights or claims, actions, proceedings, suits, causes of actions or demands whatsoever that the State may have against anyone other than defendant, its directors, officers and employees; or

5. The State's authority to enforce any and all applicable laws for the protection of the public health, welfare and the environment.

Exh. 65.

In response, PVS Chemicals requested that references to the settlement as being "partial" be deleted and that the italicized portion of the following paragraph be added into the Reservation of Rights:

Nothing contain in this Stipulation and Order shall be construed as barring, diminishing, adjudicating or in any way affecting:

1. The State's right to proceed against defendant for any liability that may result from the State's determination, *after review of the reports submitted upon performance of the Site Investigation Work Plan*, that further groundwater and/or soil-related measures are required *by law to be performed* by defendant, and defendant's right to defend against the same;

Exh. 66.

On April 18, 2002, the parties entered into a Stipulation and Order of Settlement ("2002 Order of Settlement"). Dkt. #73. In addition to the aforementioned provisions, the parties agreed that this Court would "retain jurisdiction over the subject matter of this action and the Parties to this Stipulation and Order to enforce its terms and conditions upon application by either party, and to resolve disputes arising hereunder." Dkt. #103-4, p.14. Such jurisdiction encompasses "[a]ny dispute that arises with respect to the meaning or application of this Stipulation and Order, or with respect to any work, action, plan, schedule or submittal pursuant to this Stipulation and Order." Dkt. #103-4, p.17.

PVS Chemicals performed its obligations as set forth in the 2002 Order of Settlement. Dkt. #80, ¶ 7.

Testing of groundwater conditions at the site conducted in 1986, 1989, 1993, 2001, 2002 and 2003 all confirm concentrations of cadmium, arsenic and chlorobenzene in excess of standards. Dkt. #80, ¶ 27.

In April of 2008, the United States Department of the Interior ("USDOI"), prepared a Preassessment Screen for the Buffalo River which determined that there was a reasonable probability that a successful claim for damages to natural resources could be pursued against potentially responsible parties for the release of hazardous substances into the environment. Exh. 72. In reliance upon this document, the USDOI advised PVS Chemicals, *inter alia*, that it had been identified as a potentially

responsible party and invited PVS Chemicals to participate in the development, performance and funding of a damage assessment. Exh. 79.

PVS Chemicals declined to participate in the process. Exh. 80. By letter dated May 29, 2009, PVS Chemicals challenged any basis for identification as a potentially responsible party, explaining:

> According to the [report referenced in the Preassessment Screen], Site 107 was "excavated and filled with clean fill in 1977," four (4) years before Allied Chemical sold Lee Street to PVS. Therefore the G/G Report estimates of toxic loading related to site 107 appear to lack any causal relationship to PVS' involvement at Lee Street.
>
> In addition, NYSDEC published a Buffalo River Remedial Action Plan Status Report dated June 1999 ("Report"). Table A-1 of the Report lists site 107 as Number 915004 and states under "Remediation Status" that a Phase II investigation was completed, that the site was "Delisted February 1993," and that "[i]nvestigations did not indicate the presence of hazardous waste on site." Therefore the materials you provided to us fail to suggest a basis for including PVS as a Potentially Responsible Party in an NRD action.
>
> Your letter also refers to a report prepared by Frontier Technical Associates dated May 2, 2003. Section 1.7 of that report, which is entitled "Groundwater Monitoring Report First Quarter 2003,"[1] follows the summary of testing results for each well with comments that the constituents detected are consistent with previous periods of testing and historical results. . . . Those comments also suggest that the alleged discharges were addressed in a prior litigation and the settlement thereof, namely New York v. PVS Chemicals, Inc, WDNY Case No. 97 CV 05906A [sic].

Exh. 81.

---

[1] The Frontier Report can be found at Exh. 93.

On July 12, 2010, the NYSDEC informed PVS Chemicals of its intent to designate the site as a potential hazardous waste disposal site. Exh. 82. In support of this action, the NYSDEC explained:

> A sludge lagoon was used for about 47 years for the disposal of various wastes. This lagoon was excavated in 1977. The excavated material was transported to the Land Reclamation site in Cheektowaga. The excavation was backfilled with earth taken from the plant grounds. Three groundwater monitoring wells have been installed between the lagoon site and the Buffalo River. The wells were sampled by the U.S. Geological Survey in July of 1982. The samples were analyzed for chromium, copper, iron, lead, nickel, vanadium, and sulfide. In 1984 two bedrock wells were installed to allow P.V.S. Chemicals to monitor the two RCRA regulated lagoons on the property. A Phase I Investigation has been completed. A Phase II Investigation report was completed in 1989. As part of the Phase II Investigation four additional monitoring wells were installed and sampled, the two bedrock wells were also sampled. There are also two RCRA-regulated lagoons on the property that were used from 1974 to 1984 for the collection of the same waste streams. These lagoons were closed 1984, but post-closure monitoring of the shallow groundwater was not adequate to determine impacts from the lagoons. After lengthy negotiations with P.V.S., a Stipulation and Order of Settlement was signed between P.V.S. and the NYS Attorney General. This agreement called for a number of issues to be addressed, including implementation of a groundwater and soil investigation. P.V.S. completed both the soil and groundwater investigation in 2002. The results indicated the groundwater standards are exceeded in several areas of the plant site.

Exh. 82. More specifically, the Report stated that "NYS groundwater standards are exceeded for lead and iron" and "the groundwater ph ranges from 3.2 to 3.9." Exh. 82.

On July 15, 2010, the NYSDEC provided PVS Chemicals with a proposed Order on Consent requiring PVS Chemicals to submit work plans for an Inactive

Hazardous Waste Disposal Site Remedial Program, including a Site Characterization

Work Plan; a Remedial Investigation/Feasability Study; Interim Remedial Measure

Work Plan; a Remedial Design/Remedial Action Work Plan; and a Site Management

Plan. Dkt. #80-1.

PVS Chemicals refused to execute the Consent Order based upon the

terms of the 2002 Order of Settlement. Dkt. #80, ¶ 14.

By letter dated November 15, 2010, the State of New York responded:

> The purpose of performing the Site Investigation Work Plan
> was, by its terms, to gather and submit to DEC additional
> information regarding environmental conditions at the PVS
> site, obtained mainly through installation and sampling of
> new wells, redevelopment and resampling of existing wells,
> and soil sampling. As stated by DEC representatives at our
> October 27th meeting, it is their review of data contained in
> the reports submitted under the Site Investigation Work
> Plan, together with more recently obtained data concerning
> Buffalo River sediments and adjacent properties, that are
> the bases for the Department's determination to require
> under applicable law that PVS perform a remedial program,
> consisting of further groundwater and soil-related measures,
> to address hazardous waste conditions at the PVS site.

Exh. 85.

By letter dated November 24, 2010, the State of New York advised PVS

Chemical that based on the investigative work undertaken pursuant to the 2002 Order

of Settlement, the NYSDEC "has determined that remedial measures are necessary."

Exh. 86.

By letter dated October 6, 2011, the NYSDEC advised PVS Chemicals
that its facility had been added to the Registry of Inactive Hazardous Waste Disposal
Sites in New York State as a Class 2 site. Exh. 83. The Site Information Report
explains:

> From 1930 to 1977 an unlined seepage pit (lagoon) was
> used to receive various wastewater streams from production
> processes. The liquid wastes included nitric and sulfuric
> acid, sulfur drainings, and nitric rinses containing cadmium
> and other metals. Groundwater monitoring wells were
> installed at the site beginning in 1982 as part of the RCRA
> monitoring program. Additional environmental investigations
> (Phase I and II reports) were completed by 1989. Pursuant
> to a 2002 Stipulation and Order of Settlement between the
> State of New York and PVS Chemicals, Inc., PVS conducted
> a groundwater and soil-related investigation at the site,
> which was completed in 2003. The purpose of the
> investigation was to gather and submit to DEC additional
> information regarding environmental conditions at the site,
> obtained mainly through installation and sampling of new
> wells, redevelopment and re-sampling of existing wells and
> soil sampling. Under the 2002 Stipulation and Order the
> State expressly reserved its right to proceed against PVS for
> any liability that may result from the States determination,
> after review of the reports, submitted upon performance of
> the Site Investigation Work Plan, that further groundwater
> and/or soil-related measures are required by law to be
> performed by PVS. The State also reserved its authority to
> enforce any and all applicable laws for the protection of the
> public health, welfare and the environment.

Exh. 83. The Site Information Report lists sulfuric acid, arsenic, cadmium and
chlorobenzene as contaminants of concern. Exh. 83.

By letter dated November 8, 2011, PVS Chemicals objected to the re-
listing of the site, noting that "the Site Information Report . . . demonstrates that the
levels of 'contaminants of concern' on the Site are substantially unchanged since the

1993 de-listing." Exh. 84. PVS Chemicals noted that

> Environmental surveys of the Site performed by DEC, dated
> January, 1986 and October, 1989 show that those
> "contaminants of concern" appear in groundwater
> concentrations that are comparable to those shown on
> Groundwater Monitoring Reports conducted in 2002, as part
> of the Site Investigation Work Plan required in Article XIII of
> the Order. We are unaware of any testing of conditions at
> the Site that would suggest any change in the levels of
> "contaminants of concern" from DEC's own testing in 1986
> and 1989, to the de-listing in 1993, to the settlement in 2002,
> to the present.

Exh. 84. PVS Chemicals noted that NYSDEC "has failed to disclose any changes in the

Site itself or any other relevant facts or circumstances that would make the Site any

more of a significant threat to the public health or environment than when DEC de-listed

the Site in 1993 or signed the Stipulation and Order of Settlement with PVS in 2002."

Exh. 84.


By letter dated January 20, 2012, NYSDEC relied upon the water

monitoring completed by PVS Chemicals, the NYSDEC Buffalo River Sediment Study,

Buffalo Color Corporation's Remedial Investigation Report and a 2003 change in the

statutory definition of hazardous waste to support its determination to list the Site. Exh.

87. More specifically, the NYSDEC advised PVS Chemicals that PVS Chemicals'

groundwater monitoring results indicated

> the presence of the hazardous wastes, chlorobenzene,
> arsenic and cadmium in concentrations as high as 3.7 parts
> per million (ppm), 7.16 ppm and 5.7 ppm respectively.
> These concentrations exceed the applicable groundwater
> quality standard . . . . The data also indicated that the
> groundwater in five of the nine wells exhibited a pH lower
> than the groundwater quality standard of 6.5. Finally, the
> water level data contained in the MACTEC Remedial

Investigation Report indicates that the downward movement of groundwater is restricted and moves laterally toward the Buffalo River.

Laboratory analysis of Buffalo River sediment samples taken adjacent to the Site as part of the Buffalo River Sediment Study indicated the presence of these same hazardous wastes.

* * *

Effective October 7, 2003[2] the legislature amended ECL 27-1301.1 by expanding the definition of hazardous waste to include hazardous substances. ECL 27-1301.1 now defines hazardous waste as ". . . *waste* which appears on the list or satisfies the characteristics promulgated by the commissioner pursuant to section 27-0903 of this article *and* any *substance* which appears on the list promulgated pursuant to section 37-0103 of this chapter; . . ." (Italics added). This List of Hazardous Substances is found in Table 1 under 6 NYCRR 597.2. To qualify as a hazardous substance appearing on the List of Hazardous Substances, it is not necessary to know the industrial process that generated the substance. It suffices simply to show that a particular substance appears on the List of Hazardous Substances.

Chlorobenzene, arsenic and cadmium each appear in the Site's groundwater in concentrations exceeding groundwater standards. Arsenic and cadmium appear in the Buffalo River sediment in concentrations exceeding levels of protection. Chlorobenzene, arsenic and cadmium also appear on the List of Hazardous Substances. Because of the expanded

_____

[2] Prior to October 7, 2003, ECL 27-1301.1 defined hazardous waste as "a waste which appears on the list or satisfies the characteristics promulgated by the commissioner pursuant to section 27-0903 of this chapter . . . "

As of October 7, 2003, ECL 27-1301.1 defines hazardous waste as "a waste which appears on the list or satisfies the characteristics promulgated by the commissioner pursuant to section 27-0903 of this article and any substance which appears on the list promulgated pursuant to section 37-0103 of this chapter provided, however, that the term "hazardous waste" does not include: . . . ."

The Court notes that the State of New York's Second Amended Complaint, filed prior to the amendment, alleges that the spilled acidic materials were hazardous wastes as defined by New York law. Exh. 45, ¶ 59.

definition of hazardous wastes that now includes hazardous
substances and the considerations noted above, the
Department placed the Site on the Registry and classified
the Site as significant threat to public health or the
environment.

Exh. 87.


By Notice of Motion filed March 16, 2012, PVS Chemicals sought an

Order directing the State of New York to remove its facility from the registry of Class 2

Inactive Hazardous Waste Disposal Sites; precluding the State of New York from

commencing further proceedings relating to environmental conditions known to it at the

time of the 2002 Order of Settlement, and granting PVS Chemicals' costs and

attorneys' fees related to this motion. Dkt. #80.


By Decision and Order entered January 2, 2014, this Court determined:

The 2002 Order of Settlement resolves "all pending civil
claims and liabilities against [PVS Chemical] that are alleged
in the complaint and occurred at the facility prior to the
effective date of this Stipulation and Order." Dkt. #73, pp.12.
The complaint encompassed claims of disposing of
pollutants to the ground and maintaining illegal solid and
hazardous waste activities and contaminant conditions at
PVS Chemicals' Buffalo facility. Dkt. #1 & Dkt. #73, p.1. In
addition, the State was aware of the soil conditions at the
time of the 2002 Order of Settlement and there is no dispute
that these conditions have remained constant subsequent to
the 2002 Order of Settlement. Dkt. #80, ¶¶ 13, 26 & 27.
Thus, the State of New York did not utilize the results of the
site investigation work plan conducted by PVS Chemicals
pursuant to the 2002 Order of Settlement to determine that
further groundwater and/or soil-related remediation
measures were necessary nor does it rely upon newly
discovered information about the conditions at the site to
justify further administrative action. Dkt. #80, ¶ 7.
Accordingly, the unambiguous language of the release

prevents the State of New York from proceeding against PVS Chemicals with respect to any groundwater and/or soil-related measures relating to conditions known to exist at the time of the 2002 Order of Settlement. This determination does not usurp the State's authority to determine that these hazardous wastes constitute a significant threat to the public health or environment and to develop and implement an inactive hazardous waste disposal site remedial program for the site, however, but only enforces the State of New York's release of PVS Chemicals for the costs of any such remediation.

Dkt. #87, pp.7-8. As a result, the Court precluded the State of New York from commencing further proceedings against PVS Chemicals to develop, implement or fund an inactive hazardous waste disposal remediation program for PVS Chemicals' Buffalo facility relating to environmental conditions known to it at the time of the 2002 Order of Settlement. Dkt. #87, p.8.

The Court of Appeals for the Second Circuit determined:

There is a reasonable basis for interpreting the contract to release all civil claims against PVS based on environmental conditions known to New York as of the effective date of the settlement order. The settlement order's Reservation of Rights clause, which reserves "[t]he State's right to proceed against [PVS] for any liability that may result from the State's determination, after review of [site investigation reports submitted by PVS], that further groundwater and/or soil-related measures are required by law to be performed by [PVS]," can be read to apply only where, on the basis of its review of the site investigation reports, New York discovers new or worsened environmental conditions that require "further" remediation. However, the Reservation of Rights clause can also reasonably be read to encompass environmental conditions known to New York when the District Court filed the settlement order. The clause is not explicitly limited to unknown

> or worsened environmental conditions, nor does it
> state that New York must base its decision to initiate
> further proceedings on its review of the site
> investigation reports.

*New York v. PVS Chemicals, Inc. (New York),* 589 F. App'x 10, 11 (2d Cir. 2014).

Having concluded that the language of the settlement order was ambiguous, the Court

of Appeals vacated the Court's determination insofar as it enjoined New York from

commencing remediation proceedings against PVS and remanded the case back to this

Court to afford the parties a full opportunity to present extrinsic evidence as to the

parties' intent. *Id.*

On April 23, 2015, Buffalo Niagara Riverkeeper observed construction

activity at PVS Chemicals and requested an investigation of the Site by NYSDEC.

The NYSDEC issued a complaint on August 19, 2015. Dkt. #103-1. On

September 9, 2015, the NYSDEC issued an amended complaint charging PVS

Chemicals with disturbing soils at the Site, thereby interfering with a remedial program

at the site without notifying the NYSDEC; failing to obtain a State Pollutant Discharge

Elimination system ("SPDES") General Permit for Stormwater Discharges from

Construction Activity - GP-0-15-2 as required when disturbing soil; and failing to control

erosion and sediment in compliance with SPDES Permit - NY 0110043 regarding

discharges into the Buffalo River. Dkt. #103-2.

In its Answer, PVS Chemicals disputes the propriety of the listing of the

Site on the Registry and disputes the existence of a remedial program, except to the

extent that the terms of the 2002 Order of Settlement constitutes a remedial program, in which case PVS Chemicals argues that any dispute regarding such terms must be resolved pursuant to the dispute resolution procedures set forth in that Order. Dkt. #103-4. Moreover, PVS Chemicals argues that there are no allegations that it failed to control erosion and sediment in violation of the SPDES Permit and that its construction activities, which were subject to a construction permit issued by the City of Buffalo, did not take place within the parameters of the watershed and did not disturb more than one acre of soil. Dkt. #103-4. Finally, PVS Chemicals argues that it has a permit to remove excavated soil from the Site and submits the results of independent tests demonstrating that the soil tested nonhazardous and was properly manifested and disposed of at a permitted facility. Dkt. #103-4.

PVS Chemicals seeks a stay and transfer of the NYSDEC proceedings to this Court for resolution pursuant to the 2002 Order of Settlement. Dkt. #103.

## DISCUSSION AND ANALYSIS

The State of New York argues that the circumstances surrounding the drafting and execution of the settlement agreement demonstrate that it reserved its rights to proceed against PVS Chemical for groundwater remedial measures after review of the Site investigation results and that this reservation of rights was agreed to by PVS as an express exception to the release section of the settlement agreement. Dkt. #98, p.21.

PVS Chemicals argues that during extensive negotiations, the parties moved from a list of open ended objectives to a stipulated order of settlement which resolved all known issues. Dkt. #99, pp.3-5. More specifically, PVS Chemicals argues that there is no reasonable basis for the State of New York to believe that the release it gave for known site conditions would allow the same conditions to be the basis for the 2011 relisting and demand for remediation. Dkt. #99, p.13. PVS Chemicals asserts that no new information has been received which justifies relisting the site and emphasizes that it is undisputed that the groundwater and soil conditions at the site are virtually unchanged since before the 2002 Order of Settlement. Dkt. #102, p.8. Dkt. #99, p.22.

The State of New York responds that it accepted the groundwater investigation offered by PVS Chemical as a way to move the regulatory ball forward but would not have afforded PVS Chemicals a pass on the consequences of the results of such investigation. Dkt. #101, p.3. More specifically, the State of New York asserts that it reserved its rights to determine that groundwater remediation was necessary. Dkt. #101, p.3. Pursuant to New York Environmental Conservation Law § 27-1305(2)(b), the State of New York notes that it has an ongoing obligation to "assess and, based on new information, reassess," the listing of hazardous waste sites in order to redress environmental problems. Dkt. #101, p.11. The State of New York also emphasizes that the legislature expanded the definition of hazardous waste to include the hazardous substances contaminating the site subsequent to the settlement agreement. Dkt. #101, p.11.

Where the contract language creates ambiguity, the Court may consider extrinsic evidence as to the parties' intent. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). If such evidence exists, the meaning of the ambiguous contract is a question of fact for the factfinder. *Id.* Ambiguity alone is not enough to preclude summary judgment, however. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994). "Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." *Williams & Sons Erectors v. South Carolina Steel*, 983 F.2d 1176, 1183-84 (2d Cir. 1993). Thus, the "Court may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere de CIC et de L'Union Europenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 159 (2d Cir. 2000).

To decide in favor of the State of New York, a fact finder would have to believe that PVS Chemicals spent years negotiating a settlement which left it open to liability for remediation of the same environmental conditions that existed when the NYSDEC removed the site from the Registry in 1993. Furthermore, a fact finder would have to ignore the fact that the settlement resolves all pending civil claims and liabilities except those which the State lacks knowledge or which occurred after the execution of the settlement. There is no dispute but that the hazardous substances set forth in the

Site Information Reports justifying the addition of the facility to the Registry in 2011, *to wit*, sulfuric acid, arsenic, cadmium, chlorobenzene, lead and iron, are the same substances identified in the investigations preceding the second amended complaint. There are also no allegations of subsequent releases. Furthermore, negotiations over the language in the 2002 Order of Settlement demonstrate that the State of New York removed its demand for remediation of groundwater related issues in anticipation of a partial release reserving the parties' rights to negotiate remediation following completion of the Site Investigation Work Plan, but then agreed to remove language denoting the Order as a Partial Settlement. As a result, it remains the determination of this Court that the State of New York is precluded from commencing further proceedings against PVS Chemicals to develop, implement or fund an inactive hazardous waste disposal remediation program for PVS Chemicals' Buffalo facility relating to environmental conditions known to it at the time of the 2002 Order of Settlement. However, the determination as to whether the property is properly listed on the Registry and whether PVS Chemicals' complied with environmental regulations during construction on the property in 2015 is beyond the purview of the 2002 Order of Settlement and most appropriately addressed within the NYSDEC administrative process.

**CONCLUSION**

The State of New York is precluded from commencing further proceedings against PVS Chemicals to develop, implement or fund an inactive hazardous waste disposal remediation program for PVS Chemicals' Buffalo facility relating to

environmental conditions known to it at the time of the 2002 Order of Settlement. The

remainder of PVS Chemicals' request for relief is denied.

**SO ORDERED.**

DATED:      Buffalo, New York
               July 27, 2018

                        *s/ H. Kenneth Schroeder, Jr.*
                        **H. KENNETH SCHROEDER, JR.**
                        **United States Magistrate Judge**